# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SCOTT SNEDEKER, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. 3:13-970 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| Acting Commissioner of | § | |
| Social Security, | § | |
| | § | |
| *Defendant.* | § | |

## REPORT AND RECOMMENDATION

Scott Snedeker ("Snedeker") seeks review of an adverse decision on his applications for disability insurance and supplemental security income benefits under the Social Security Act.[1]

## I. Judicial Review

A reviewing court's limited role under 42 U.S.C. § 405(g) is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence. *See Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 42 U.S.C. § 405(g). Further, Congress directs reviewing courts to take "due account" of "the rule of prejudicial error." 5 U.S.C. § 706; *see also* 28 U.S.C. § 2111 (directing that

---

[1] Disability Insurance, authorized by Title II of the Social Security Act and funded by social security taxes, provides income to insured individuals forced into involuntary, premature retirement by reason of disability. Supplemental Security Income, authorized by Title XVI of the Social Security Act and funded by general tax revenues, provides an additional resource to assure that disabled individuals' incomes do not fall below the poverty line.

judgments given upon examination of records be "without regard to errors or defects which do not affect the substantial rights of the parties"); *see also* FED. R. CIV. P. 61 (stating that "the court must disregard all errors and defects that do not affect any party's substantial rights").

## II. Background

*A.    Personal*

Snedeker, born in 1967, dropped out of school in the seventh grade. (T. 58-59). Thereafter, he worked for twenty years as a mechanic. (T. 59). In 2006, his hands and elbows began to bother him. (T. 60). He had bilateral carpal tunnel surgery, but could not return to work as a mechanic because his hands painfully cramped when performing fine manipulation. (T. 60-61).

He began working on a dairy farm as a calf raiser/barn cleaner. (T. 61, 235-36). He stopped raising calves because of his hands bothering him, and then began driving farm tractors because that work was a little bit easier. (T. 61-62). In December, 2009, his elbows and shoulder became "worse and worse," until he could no longer work. (T. 62).

In March, 2010, Snedeker had right shoulder hemiarthroplasty surgery. (T. 62, 313). He returned to tractor work, but, in May 2010, when getting up into a tractor, he felt a sharp pain in his right arm. (T. 63). His right arm and elbow became worse, and then his left arm and elbow started to become painful. (T. 64). He had left shoulder arthroscopy surgery in June 2011. (T. 367).

Snedeker claims he cannot lift his right hand above waist high without trembling in pain, nor carry a gallon of milk without problems. (T. 64-65). If he does "too much" with his arms, both elbows swell and bother him for several days. (T. 67). Snedeker also maintains that his back and legs hurt when he

stands or sits too long. "[I]t feels like somebody's sticking a knife into it." (*Id.*). After a half-hour, he has to move around. (T. 67-68). His legs "go numb and hurt." (T. 69). He takes pain medication for his back, antidepressants for his mood, and other medication for diabetes, cholesterol, and hyperlipidemia. (T. 70-72, 76).

Snedeker is obese, standing 5'10" and weighing, at times, as much as 267 pounds. (T. 74-75). He has difficulty sleeping due to pain. (T. 73).

*B.   Claim*

In July, 2010, Snedeker applied for disability insurance benefits and supplemental security income benefits, claiming that he became unable to work as of December 22, 2009, due to "right shoulder replacement, carpal tunnel both hands, arthritis, diabetes, right leg and ankle problems, hypertension, and high cholesterol." (T. 271). Snedeker's claim was assigned to administrative law judge, Elizabeth W. Koennecke ("ALJ Koennecke"), who conducted an evidentiary hearing in December 2011. (T. 55-86). Snedeker, represented by legal counsel, attended and testified. (*Id.*). On May 31, 2012, ALJ Koennecke held a subsequent hearing at which Donald Goldman, M.D., an impartial medical expert, testified telephonically over objection. (T. 28-54).

ALJ Koennecke denied Snedeker's applications in a written decision dated June 13, 2012. (T. 11-22). The Appeals Council denied Snedeker's request for review. (T. 1-6). Snedeker then instituted this proceeding.

## III. Commissioner's Decision[2]

ALJ Koennecke first found that Snedeker met the insured-status requirements of the disability insurance benefits program at all relevant times.[3] (T. 14). At Step 2 of sequential evaluation, ALJ Koennecke found that Snedeker has (a) *severe* impairments of bilateral shoulder and elbow osteoarthritis, (b) *nonsevere* impairments of low back pain, hypertension, diabetes, and depression, and (c) *nonmedically determinable* impairments of knee pain, bilateral carpal tunnel syndrome, and/or any impairment related to positive testing for marijuana and opiates. (T. 14-16).

ALJ Koennecke assessed Snedeker's residual functional capacity as follows:

> ... [T]he claimant has the residual functional capacity to lift, carry, push, and pull up to 20 pounds occasionally and 10 pounds frequently. He can work with any weight at waist level, but can perform no work above shoulder level. He can perform no reaching behind with his right arm. He has no other manipulative limitations on his ability to reach, handle, finger, and feel. He can perform unlimited sitting, standing, walking, kneeling, stooping, crouching, and crawling. He cannot climb ladders or scaffolds.

(T. 17).

---

[2] ALJ Koennecke utilized a five-step sequential evaluation procedure prescribed by regulation and approved by courts as a fair and just way to determine disability applications in conformity with the Social Security Act. The procedure is "sequential" in the sense that when a decision can be reached at an early step, remaining steps are not considered. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (citing *Heckler v. Campbell*, 461 U.S. 458, 461 (1983)). A full discussion of the Commissioner's five-step process is contained in *Christiana v. Commissioner of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).

[3] Disability Insurance typically is more generous than Supplemental Security Income benefits. Once ALJ Koennecke determined that Snedeker was fully insured, his claim for Supplemental Security Income effectively became moot.

At Step 4, ALJ Koennecke found that Snedeker remains able to perform his past relevant work as a calf raiser as that job was actually performed.[4] (T. 20). ALJ Koennecke made alternative Step 5 findings that other jobs exist in the national economy that Snedeker can perform. (*Id*.). ALJ Koennecke relied on the framework of Medical-Vocational Guidelines, Section 202.17[5] to make this finding. (T. 20-21). Thus, Snedeker's application was denied. (T. 21).

## IV. Points of Alleged Error

Snedeker's brief proffers four points of error as follows:

1. Failure to assess all severe impairments;
2. The ALJ's residual functional capacity determination is not supported by substantial evidence;
3. The ALJ violated the treating physician rule; and
4. The ALJ violated Plaintiff's due process rights by forbidding Plaintiff from conducting cross-examination.

(Dkt. No. 14).

---

[4] This finding is anomalous given ALJ Koennecke's residual functional capacity finding that Snedeker is limited to lifting 20 pounds occasionally and only 10 pounds frequently. Snedeker indicated that he lifted 50 pounds when working with calves, and further described that job as having to scrape beds-spread manure with a manure scraper, which is like a garden hoe, 5-10 hours a day, depending on how many barns were done in a day. (T. 236).

[5] The Medical Vocational Guidelines ("grids") are a matrix of general findings established by rule as to whether work exists in the national economy that a person can perform. When properly applied, they ultimately yield a decision of "disabled" or "not disabled." *Zorilla v. Chater*, 915 F. Supp. 662, 667 & n. 2 (S.D.N.Y. 1996); *see also Bombard-Senecal v. Commissioner of Soc. Sec.*, No. 8:13-cv-649 (GLS), 2014 WL 3778568, at *4 (N.D.N.Y. July 31, 2014)(citing 20 C.F.R. pt. 404, subpt. P, app. 2, § 202.21 (directing a finding of "not disabled" for younger individuals capable of performing light work that have at least a high school education and can speak English).

## V. Discussion and Analysis

*A.     Step 2 Finding Regarding Low Back Impairment*

ALJ Koennecke acknowledged that a recent magnetic resonance imaging test (MRI) of Snedeker's lower spine "showed facet arthropathy and endplate osteoarthritis with a slight mass effect to the L5-S1 nerve root." Nevertheless, she found the impairment nonsevere because:

> Notably, there is no evidence to indicate that any symptoms related to this new diagnosis has (*sic*) lasted or is (*sic*) expected to last for 12 months or more. Therefore, this condition does not meet the durational requirement to be considered a severe impairment.

(T. 15). Later, she added:

> [T]here is *no evidence* to support any functional restrictions that have been imposed based on the claimant's back pain. . . . With *no evidence from a medically acceptable source* to establish a significant limitation on the claimant's ability to perform basis work activities, these are not severe impairments . . . .

(*Id.*) (emphasis added).

*B.     Snedeker's Challenge; Commissioner's Response*

Snedeker argues that ALJ Koennecke erred in declining to find his low back pain a severe impairment. Snedeker points to his lumbar spine MRI showing nerve root compression at L5-S1. (T. 421). He also argues there is no basis for ALJ Koennecke's finding that his low back impairment fails to meet the durational requirement because a degenerative condition reasonably can be expected to last for a continuous period of not less than 12 months. Finally, Snedeker argues that, contrary to ALJ Koennecke's finding, there was ample evidence of lower-back-related functional limitations. (Dkt. No. 14, pp. 9-12).

The Commissioner responds that Snedeker cannot carry his evidentiary burden to demonstrate a severe low back impairment by relying on subjective statements alone. Further, the Commissioner argues that ALJ Koennecke's finding is supported by a medical expert's testimony (that Snedeker has no limitation of function regarding his back) and a treating orthopedic surgeon's questionnaire responses ( stating that Snedeker's ability to sit, stand and walk are not impacted by his condition). Finally, the Commissioner argues that even if ALJ Koennecke should have treated Snedeker's back pain as a severe impairment, any error was harmless because ALJ Koennecke proceeded beyond Step 2 of sequential analysis. (Dkt. No. 16, pp. 4-7).

*C.    Governing Principles*

"Impairments" are "anatomical, physiological, or psychological abnormalities . . . demonstrable by medically acceptable clinical and laboratory techniques." *See* 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D); 20 C.F.R. §§ 404.1508, 416.908. "Severe impairments" are those that significantly limit physical or mental abilities to do basic work activities.[6]    *See* 20 C.F.R. §§ 404.1521(b), 416.921(b); *see also* SSR 85–28, TITLES II AND XVI: MEDICAL IMPAIRMENTS THAT ARE NOT SEVERE, 1985 WL 56856, at *3-4 (SSA 1985).

---

[6]    Regulations define "basic work activities" as "abilities and aptitudes necessary to do most jobs," examples of which include:

> (1) physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521(b), 416.921(b).

The phrase "significantly limits" is not synonymous with "disability." Rather, it serves to "screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). Consequently, "[a] finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' . . . [with] . . .'no more than a minimal effect on an individual's ability to work.'" *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting *Bowen v. Yuckert*, 482 U.S. 137, 154 n. 12 (1987)).

D. Application

    1. <u>Legal Errors</u>

While *existence* of an impairment cannot be based wholly on subjective statements, no legal bar prevents reliance on such evidence to find that an impairment has more than minimal effect on an individual's ability to work. ALJ Koennecke's requirement that an acceptable medical source specify a functional restriction tied to low back pain as a precondition for severe-impairment finding imposes an evidentiary burden more stringent than this circuit's *de minimis* threshold.

ALJ Koennecke may have a committed a second legal error. Courts within this circuit have discerned errors when *statutory* disability-duration analysis[7] is conflated with *regulatory* impairment-severity analysis. Reasoning that an impairment's severity is analytically distinct from its chronological duration, they find legal error when the only basis for a Step 2 non-severity

---

[7] The Social Security Act defines "disability" as inability "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d) (disability insurance), 1382c(a)(3)(A) (supplemental security income).

finding is insufficient duration. *See Durgan v. Astrue,* No. 12–CV–279 (DNH/CFH), 2013 WL 1122568, at *3 (N.D.N.Y. Feb. 19, 2013); *Gray v. Astrue,* No. 04–CV–3736 (KMW/JCF), 2009 WL 1598798, at *5 (S.D.N.Y. June 8, 2009) (citing *Stadler v. Barnhart*, 464 F. Supp.2d 183, 189 (W.D.N.Y. 2006) ("[t]o state that an impairment is not severe because it does not meet the twelve-month requirement ... is inconsistent with the . . . regulations")). Hence, ALJ Koennecke's reliance on perceived lack of evidence proving that Snedeker's recent low back symptoms will satisfy the statutory durational element of disability to find that impairment not severe may constitute legal error.

2. Factual Errors

ALJ Koennecke's *factual* finding that Snedeker's low back impairment does not meet the durational requirement is patently unreasonable. Undisputed medical evidence reflects that Snedeker's low back impairment is a degenerative joint disease. Degenerative impairments are, by nature, long-term and they typically worsen with time. Therefore, no reasonable mind could conclude that within 12 months of onset, there would be, or a reasonable expectation that there would be sufficient restoration of function so that there is or will be no significant limitation of the ability to perform basic work-related functions.[8] ALJ Koennecke erred when making this finding.

ALJ Koennecke further erred factually when stating no evidence from a medically acceptable source or any other source establishes a significant lower-back limitation on Snedeker's ability to perform basic work activities. Lawrence

---

[8] ALJ Koennecke had a separate burden to articulate a rationale for concluding that Snedeker was expected to experience restoration of function within 12 months of onset. *See* SSR 82-52, TITLES II AND XVI: DURATION OF THE IMPAIRMENT, 1982 WL 31376, at *3 (SSA 1982).

Wiesner, D.O., a *consulting* and "acceptable" medical source,[9] examined Snedeker's lumbar spine on December 16, 2011, and thereafter completed a form titled "Work Capacities." Therein, he opined that due to Snedeker's back, his maximum ability to sit, stand, and walk is "less than 2 hrs" per day. (T. 476). In Dr. Wiesner's opinion, Snedeker can sit for only thirty minutes before needing to change positions; he needs to walk around every thirty minutes; he needs to be able to shift at will from standing/sitting; he will sometimes need to lie down at unpredictable intervals; and he is limited to rarely (*i.e.*, less than 1/3 of the work day) stooping, crouching, and reaching. (T. 476-77). He further found that Snedeker's impairment would cause him to be absent from work more than three times per month.[10] (T. 478).

Additionally, Snedeker was treated at a medical clinic named "Lourdes Primary Care Associates" on six occasions beginning in June, 2010, and continuing through January, 2012, for chronic back pain in the lumbosacral spine and associated symptoms (numbness, burning, tingling). (T. 335, 411, 412, 413, 500, 523). Progress notes entered by Joseph F. Brunt, PA, following

---

[9] The Commissioner categorizes medical opinion evidence by "sources" described as "treating," "acceptable" and "other," and prescribes hierarchical rules for weighing such evidence. *See* 20 C.F.R. §§ 404.1502, 404.1513(a), 416.913(a), 416.902. Evidence from all three sources can be considered when determining severity of impairments and how they affect individuals' ability to function. *See* SSR 06-03p, TITLES II AND XVI: CONSIDERING OPINIONS AND OTHER EVIDENCE FROM SOURCES WHO ARE NOT "ACCEPTABLE MEDICAL SOURCES" IN DISABILITY CLAIMS, 2006 WL 2329939, at *4 (SSA Aug. 9, 2006)("Although the factors in 20 C.F.R. 404.1527[c] and 416.927[c] explicitly apply only to the evaluation of medical opinions from 'acceptable medical sources,' these same factors can be applied to opinion evidence from 'other sources.'").

[10] Upon physical examination, Dr. Wiesner reported that Snedeker's lumbar spine has restricted forward flexion at 40 degrees, extension to 10 degrees, rotation to 30 degrees each side. (T. 474). His muscle strength in his lower extremities was 5/5. (*Id.*). Dr. Wiesner's impression was multiple areas of degenerative joint disease including shoulders, elbows, and low back. (*Id.*).

physical examinations, observed successively that "patient has limited active and passive range of motion of the lumbar spine secondary to pain." (T. 411-12).

Snedeker's lumbar spine x-ray taken in June, 2010, revealed an unremarkable lumbar spine. (T. 336). But, as mentioned earlier, a later diagnostic lumbar spine MRI performed in July, 2011, objectively showed facet arthropathy and endplate osteophytosis contributing to slight mass effect on the exiting right nerve root, L5-S1. (T. 421).

Finally, Snedeker's subjective evidence reflects a significant lower-back limitation on his ability to perform basic work activities. Snedeker testified that his back and legs hurt if he stands or sits too long. "[I]t feels like somebody's sticking a knife into it." After half an hour, he has to move around. His legs "go numb and hurt." (T. 67-69).

In short, there was, as Snedeker maintains, ample evidence of greater-than-*de minimis* functional limitations attributable to a lower back impairment. For reasons that Snedeker vigorously attacks in subsequent points, ALJ Koennecke elected to give "little weight" to Dr. Wiesner's opinions. But even affording Dr. Wiesner's opinions little weight, the *de minimis* threshold was crossed. Similarly, ALJ Koennecke found Snedeker's subjective testimony *credible* to the extent that his medically determinable impairment could reasonably be expected to cause his alleged symptoms. Again, the *de minimis* threshold was crossed. And, not to be overlooked, ALJ Koennecke gave no reason whatsoever for disregarding PA Brunt's successive physical examination

findings that Snedeker exhibited limited active and passive range of motion of the lumbar spine secondary to pain.[11]

The Commissioner's argument that ALJ Koennecke's Step 2 finding of a nonsevere lower back impairment is supported by other substantial evidence is unpersuasive. The treating orthopedic shoulder surgeon, Kyung Kim, M.D., completed a questionnaire as well as an addendum wherein he opined that Snedeker's capacity for sitting, standing, and walking are not impacted by his condition. (T. 468-69, 525-26). He further opined that Snedeker can sit, stand, and walk for 6 hours of an 8-hour workday. (*Id*.). These responses, however, are inapposite to functional effects of Snedeker's *lower back* impairment. Dr. Kim's treatment was limited to both of Snedeker's *shoulders*, and since he had no knowledge of Snedeker's back impairment, his questionnaire and addendum responses clearly did not address the lower lumbar impairment.

Dr. Goldman, the non-examining and consulting medical expert, opined based on his review of Snedeker's medical records that Snedeker has no restriction of functioning from the waist down, specifically no restrictions for sitting, standing, walking, kneeling, squatting, or crouching. When forming that opinion, however, Dr. Goldman clearly had overlooked Snedeker's lumbar MRI showing facet arthropathy and endplate osteophytosis affecting the nerve root.[12] Once ALJ Koennecke prompted him about the MRI exhibit (within records

---

[11] A physician assistant is defined as an "other source" whose opinion may be considered regarding a claimant's impairment and how it affects ability to function. *See* 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1). Depending on particular facts in a case, and after applying regulatory factors for weighing opinion evidence, an "other source" opinion may even outweigh opinion of an "acceptable medical source." SSR 06-03p, 2006 WL 2329939 at *2.

[12] When ALJ Koennecke asked Dr. Goldman whether he would find that Snedeker has a severe back impairment, Dr. Goldman responded:

> No, I don't have –unless I missed it, your honor, I don't have an MRI of his back, I don't have a CAT scan of his back. Other than a complaint of back pain, I'm sorry to say, I have no diagnosis from an orthopedic, I have no treatment on his spine other than, you know, symptomatic complaints.

(T. 37).

previously submitted for Dr. Goldman's thorough and longitudinal review), Dr. Goldman scrambled to minimize its importance, stating that a positive radiological finding in and of itself "doesn't mean much." As an orthopedist, he looked instead for weakness, paraplegia, straight leg raising, spasm and guarding, but that "there's nothing there." (T. 37).

Reliance on Dr. Goldman's uninformed opinion regarding Step 2 severity of Snedeker's lower back impairment was misguided. ALJ Koennecke may or may not have had valid reservations about the credibility of Dr. Wiesner's forensic opinions, but Snedeker's subjective complaints of difficulties performing ordinary work activities (*e.g.*, lifting, sitting, standking walking, etc.) due to low back pain were corroborated by objective diagnostic medical evidence (MRI revealing nerve root impingement) and unchallenged clinical observations of limited active and passive range of motion of Snedeker's lumbar spine secondary to pain. To find that chronic nerve-impingement pain stemming from a medically-determinable lumbar spine abnormality produces no more than minimal effects when attempting to perform ordinary work activities such as lifting, sitting, standing, walking, kneeling, bending, squatting, or crouching is patently unreasonable absent a plausible explanation.

For all of these reasons, ALJ Koennecke's rationale for declining to find Snedeker's low back pain a severe impairment at Step 2 of sequential evaluation was legally and factually erroneous.

E. *Harmless Error Analysis*

The Commissioner argues alternatively that if ALJ Koennecke erred in making his Step 2 finding, the error was harmless because ALJ Koennecke found *other impairments* (bilateral shoulder and elbow osteoarthritis) to be

severe, and thereafter conducted a five–step sequential analysis wherein ALJ Koennecke purportedly considered *all* of Snedeker's impairments. (Dkt. No. 16, p. 7).

1. <u>Governing Principles</u>

Earlier-mentioned congressional mandates (requiring courts reviewing administrative decrees to take due account of "the rule of prejudicial error" and disregard all administrative errors and defects not affecting "substantial rights") refer to what modern jurisprudence calls "harmless error doctrine." *See Shinseki v. Sanders*, 556 U.S. 396, 406-08 (2009). Under this doctrine, a reviewing court must reverse and remand when an administrative law judge errs when reaching a decision, unless, as a matter of law, the result could not be affected by the error. *See NLRB v. Enterprise Assoc.*, 429 U.S. 507, 522 n. 9 (1977). In other words, administrative legal error is harmless when a reviewing court confidently concludes that the same result would have been reached had the error not occurred. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("[W]here application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration.").

A variant of this doctrine applies with respect to Step 2 errors. *All* impairments, *i.e.*, both severe and nonsevere, must be factored into a residual functional capacity determination that precedes sequential Step 4.[13] Several courts conclude that an error in failing to identify *all* severe impairments at Step 2 is harmless when an administrative law judge identifies *some* severe

---

[13] In making a finding regarding residual functional capacity, administrative law judges must consider all of the claimant's impairments, including impairments that are not severe. *See* 20 C.F.R. §§ 404.1520(e), 404.1545, 416.920(e), 416.945; SSR 96–8p, TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 1996 WL 374184, at *5 (SSA July 2, 1996).

impairments at Step 2, and proceeds through subsequent sequential evaluation on the basis of combined effects of *all* impairments, including those erroneously found to be nonsevere. *See Stanton v. Astrue*, 370 Fed. App'x 231, 233 n.1 (2d Cir. 2010) (summary order).[14] Thus, when functional effects of impairments erroneously determined to be nonsevere at Step 2 are fully considered and factored into subsequent residual functional capacity assessments, a reviewing court can confidently conclude that the same result would have been reached absent the Step 2 error.

2.  Application

This Step 2 variant is inapplicable here. ALJ Koennecke completely failed to mention *any* resulting limitations from low back pain when formulating Snedeker's residual functional capacity. All limitations factored in ALJ Koennecke's residual functional capacity finding relate to Snedeker's shoulder impairments. Thus, *functional effects* of Snedeker's *low back pain* were not included as essential elements of ALJ Koennecke's residual functional capacity assessment. Absent that, a reviewing court cannot conclude that a Step 2 error with respect to severity of a distinct physical impairment automatically becomes

---

[14] *See also Warren v. Astrue*, No. 10-CV-500S, 2012 WL 32971, at *4 (W.D.N.Y. Jan. 6, 2012) (despite ALJ's "lack of clarity" at step two, ALJ properly considered all the effects of all Plaintiff's impairments, making remand inappropriate); *Briggs v. Astrue*, No. 09-CV-1422 (FJS/VEB), 2011 WL 2669476, at *4 (N.D.N.Y. Mar.4, 2011) (when ALJ concluded that Plaintiff had an impairment considered severe under the Act ... and continued with the sequential analysis, any arguable error in his findings ... at step two of the analysis was harmless); *McCartney v. Commissioner of Soc. Sec.*, Civil Action No. 07-1572, 2009 WL 1323578, at *16 (W.D. Pa. May 8, 2009) ("Even if ... ALJ did err in excluding headaches from the list of severe impairments, any such error was harmless because the ALJ found other severe impairments at step two and proceeded through the sequential evaluation on the basis of Plaintiff's severe and non-severe impairments.").

harmless simply because sequential analysis proceeds through Step 5 solely on the basis of other impairments whose functional limitations may be dissimilar.[15]

Neither can a reviewing court conclude that the Step 2 error identified above is harmless under traditional analysis. Absent this error, ALJ Koennecke could have assessed Snedeker's residual functional capacity more narrowly, specifically imposing additional limitations commonly associated with lower back impairments (*e.g.*, lifting, sitting, standing, walking, kneeling, squatting, or crouching restrictions). Since some of these limitations are postural and nonexertional, an administrative adjudicator could determine that they so significantly erode Snedeker's occupational base that Medical-Vocational Guidelines would not provide a sufficient evidentiary foundation, and that testimony by a vocational expert would be necessary. A reviewing court, therefore, cannot confidently state that an accurate assessment of functional effects of *all* impairments would have resulted in Snedeker retaining residual functional capacity to meet basic demands of unskilled and light exertional work.

This precludes a harmless error finding.

## VI. Remaining Points

Snedeker's remaining points of error relate to ALJ Koennecke's residual functional capacity finding, weighting of medical source opinions, and whether due process was violated by (a) taking expert testimony by telephone over the objection of counsel and (b) forbidding Snedeker's counsel from conducting legitimate cross-examination of the medical expert.

---

[15] The mere fact that sequential evaluation proceeds beyond Step 2, does not, *ipso facto*, render a Step 2 error harmless. This harmless error construct is valid only when administrative law judges faithfully execute their responsibilities to consider functional effects of all impairments in subsequent steps.

It is pointless to address these arguments until Snedeker's low back impairment is factored into a residual functional capacity finding. The outcome of this case in its present posture will not change whether or not these additional points are meritorious or baseless. Addressing them administratively on remand, however, may avoid a second costly action for judicial review.

## VII.  Recommendation

The Commissioner's decision denying disability benefits should be REVERSED and the case REMANDED pursuant to 42 U.S.C. § 405(g), sentence four, for further proceedings.

## VIII.  Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation. Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Graham v. City of New York*, 443 Fed. App'x 657, 658 (2d Cir. 2011) (summary order); *FDIC v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the   12   day of   February   2015.

*Earl S. Hines*
Earl S. Hines
United States Magistrate Judge